UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SIERA NICOLE BRYANT,

             Plaintiff,                        Case No. 2:17-cv-10919
                                                District Judge Stephen J. Murphy, III

v.                                       Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.
_____/

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 17), GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 20) and AFFIRM THE COMMISSIONER'S DECISION

**I.    RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 17), **GRANT** Defendant's motion for summary judgment (DE 20),

and **AFFIRM** the Commissioner's decision.

**II.    REPORT**

       Plaintiff, Siera Nicole Bryant, brings this action under 42 U.S.C. §§ 405(g)

and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her application for supplemental security

income (SSI) benefits.  This matter is before the United States Magistrate Judge for

a Report and Recommendation on Plaintiff's motion for summary judgment (DE

17), the Commissioner's cross-motion for summary judgment (DE 20), and the administrative record (DE 12).

### A.    Background and Administrative History

Plaintiff alleges her disability began on January 1, 2010, at the age of 14. (R. at 112.)  She lists several conditions (depression, bipolar disorder, oppositional defiant disorder (ODD), attention deficit hyperactivity disorder (ADHD), and mood swings) that limit her ability to work.  (R. at 145.)  Her application for SSI benefits was denied on May 23, 2014.  (R. at 67-76, 80-83.)

Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (R. at 84.)  ALJ John Dodson held a hearing, and, on January 13, 2016, determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 18-36.)  On January 27, 2017, the Appeals Council denied Plaintiff's request for review.  (R. at 1-6, 14-17.)  Thus, ALJ Dodson's decision became the Commissioner's final decision.

Plaintiff timely commenced the instant action on March 23, 2017.  (DE 1.)

### B.    Plaintiff's Medical History

The administrative record contains more than 190 pages of medical records, of which Exhibits 1F through 8F were available to the ALJ at the time of his January 13, 2016 decision.  (R. at 36, 230-419.)  In addition, the Court notes

medication information from 2013 and 2015.  (R. at 197-201, 225.)  These records will be discussed in detail, as necessary, below.

### C. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified at the September 23, 2015 hearing, when she was 20 years old (R. at 42-51, 59-62), as did her legal guardian, Anthony Bowens (R. at 51-59). As Plaintiff is not expressly challenging the ALJ's credibility assessment in the instant appeal, the Court will forego further summary of her testimony here and will only refer to it as necessary below.

#### 2. Vocational Expert Testimony

Vocational expert (VE) Helen F. Topcik testified at the hearing, providing answers to several hypothetical questions.  (R. at 62-65, 217-220.)   Of particular pertinence is her testimony that a person with Plaintiff's RFC (as eventually found by the ALJ) could perform work as a housekeeper, an inspector hand packager, and a sorter, of which there were jobs in the national and regional economies. (R. at 25, 62-63.)

### D. The Administrative Decision

On January 13, 2016, ALJ Dodson issued his decision.  (R. at 18-36.)  At **Step 1** of the sequential evaluation process,[1] the ALJ found that Plaintiff had not

---

[1] *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

engaged in substantial gainful activity since January 10, 2014, the application date.
(R. at 23.)  At **Step 2**, the ALJ found that Plaintiff had the following severe
impairments:  depression/mood disorder and posttraumatic stress disorder (PTSD).
(*Id.*)  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or
combination of impairments that met or medically equaled the severity of one of
the listed impairments.  (R. at 23-25.)  Between **Steps 3 and 4** of the sequential
process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[2] and
determined that Plaintiff had the RFC:

> . . . to perform a full range of work at all exertional levels but with the
> following nonexertional limitations: except that she is limited to
> unskilled work involving 1 to 2 step repetitive tasks [*i.e., an
> understanding and memory limitation*], no production like standards
> [*i.e., a sustained concentration and persistence limitation*], only
> occasional interaction with coworkers and supervisors, and no
> working with the public [*i.e., social interaction limitations*].

(R. at 25-30; *see also* R. at 72-73.)  At **Step 4**, the ALJ determined that Plaintiff
did not have past relevant work.  (R. at 31.)  At **Step 5**, considering Plaintiff's age,
education, work experience, and RFC, the ALJ determined that there were jobs that
existed in significant numbers in the national economy that Plaintiff could perform.
(R. at 31-32.)  The ALJ therefore concluded that Plaintiff had not been under a

---

[2] The claimant's "residual functional capacity" is an assessment of the most the
claimant can do in a work setting despite his or her physical or mental limitations.
20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d
235, 239 (6th Cir. 2002).

disability, as defined in the Social Security Act, since January 10, 2014, the date

the application was filed.  (R. at 32.)

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case

under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal

standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see*

*also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under

this standard, "substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241

(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).  In deciding whether substantial evidence supports the ALJ's decision, the

court does "not try the case *de novo*, resolve conflicts in evidence or decide

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court,

to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F. Analysis

Plaintiff's sole argument on appeal is that the ALJ improperly assessed the opinion evidence. (DE 17 at 3, 14-20.) She consistently frames the issue for this appeal as follows:

> Did the ALJ erroneously discount or reject the opinions voiced by every treating source and examiner in this case, instead adopting the opinion of a medical consultant who never examined plaintiff and reviewed an incomplete record?

(*Id.* at 3, 14.)  The Commissioner argues that "the ALJ supportably discounted medical opinion evidence . . . [,]" as it was "inconsistent with, and unsupported by, the record as a whole."  (DE 20 at 3, 6-14.)

### a.    Opinion evidence regulations and rulings

By way of background, the ALJ states that he considered the opinion evidence in accordance with 20 C.F.R. §§ 404.1527, 416.927 ("Evaluating opinion evidence for claims filed before March 27, 2017.")  (R. at 25.)  This regulation provides that the SSA evaluates every medical opinion it receives and, unless it gives a treating source's medical opinion controlling weight, it considers several factors – examining relationship, treatment relationship, supportability, consistency, specialization, and other factors - in deciding the weight it gives to any medical opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c).

In addition, Plaintiff directs the Court's attention to SSR 96-2p, which discusses "giving controlling weight to treating source medical opinions."  (*See* DE 17 at 17-19.)  As this rule's policy interpretation provides:

> . . . a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2P (S.S.A. July 2, 1996).

### b.    Global Assessment of Functioning (GAF)

Plaintiff acknowledges that "ALJs are not bound by GAF scores."  (DE 17 at

14.)  As the Sixth Circuit has instructed,

> "The [Global Assessment Functioning] score is a subjective
> determination that represents 'the clinician's judgment of the
> individual's overall level of functioning.' " *Wesley v. Comm'r of Soc.*
> *Sec.,* No. 99–1226, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000)
> (quoting *Diagnostic and Statistical Manual of Mental Disorders* 30
> (4th ed.1994)). We have previously held that the failure to reference a
> Global Assessment Functioning score is not, standing alone, sufficient
> ground to reverse a disability determination. *Howard v. Comm'r of*
> *Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002) (While a Global
> Assessment Functioning score may be of "considerable help," it is not
> "essential" to determining an individual's residual functional
> capacity.); *see also Kornecky v. Comm'r of Soc. Sec.,* No. 04–2171,
> 2006 WL 305648, at *13–*14 (6th Cir. Feb.9, 2006) ("[A]ccording to
> the [Diagnostic and Statistical Manual's] explanation of the [Global
> Assessment Functioning] scale, a score may have little or no bearing
> on the subject's social and occupational functioning.... [W]e are not
> aware of any statutory, regulatory, or other authority requiring the
> ALJ to put stock in a [Global Assessment Functioning] score in the
> first place.")

> Moreover, the Commissioner "has declined to endorse the [Global
> Assessment Functioning] score for 'use in the Social Security and
> [Supplemental Security Income] disability programs,' and has
> indicated that [Global Assessment Functioning] scores have no 'direct
> correlation to the severity requirements of the mental disorders
> listings.' " *Wind v. Barnhart,* No. 04–16371, 2005 WL 1317040, at *6
> n. 5, 133 Fed.Appx. 684 (11th Cir. June 2, 2005) (quoting 65 Fed.
> Reg. 50746, 50764–65 (Aug. 21, 2000)). Accordingly, we have
> affirmed denials of disability benefits where applicants had Global
> Assessment Functioning scores of 50 or lower. *See, e.g., Smith v.*
> *Comm'r of Soc. Sec.,* No. 02–1653, 2003 WL 22025046, 74

> Fed.Appx. 548 (6th Cir. Aug. 27, 2003) (Global Assessment
> Functioning score of 48); *Nierzwick v. Comm'r of Soc. Sec.,* 7
> Fed.Appx. 358 (6th Cir.2001) (Global Assessment Functioning score
> of 35); *Thurman v. Apfel,* 211 F.3d 1270 (6th Cir.2000) (Global
> Assessment Functioning score of 50).

*DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006).

Nonetheless, Plaintiff contends that "the ALJ chose to focus his analysis on those

scores," and handled the evidence "contrary to controlling law."  (DE 17 at 14-15.)

### c.    GAF Assessments dated 2011-2012

Plaintiff was admitted to Henry Ford Kingswood Hospital Child Unit on

December 6, 2011, at which time her GAF was 25; however, when she was

discharged two days later, on December 8, 2011, her GAF was 40.  (R. at 317.)

Four months later she was admitted to Havenwyck Hospital and her GAF was

assessed at 40; however, when she was discharged three days later, on April 10,

2012, her GAF was assessed at 50.  (R. at 320.)  The ALJ explained that these

GAF scores were "too long before the application date to be relevant, as later

exams during the relevant period reveal greater level of mental functioning."  (R. at

27.)  The Court recognizes the meaning of GAF scores in the 40 to 50 range.[3]

---

[3] "A GAF Scale of … 41–50 indicates serious symptoms (e.g., suicidal ideation,
severe obsessional rituals, frequent shoplifting), or any serious impairment in
social, occupational, or school functioning (e.g., no friends, unable to keep a job); a
scale of 31–40 indicates some impairment in reality testing or communication
(e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in
several areas, such as work or school, family relations, judgment, thinking, or
mood (e.g., depressed man avoids friends, neglects family, and is unable to work;

Plaintiff acknowledges that the ALJ dismissed these assessments as stale.  (DE 17 at 15.)  *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("Although medical history is relevant to a claimant's condition, Heston's medical history should not be given more weight than that of a doctor observing plaintiff during the relevant period of disability.").

### d.     Lisa Haston-Fuller, D.O.'s July 16, 2013 opinion

In determining Plaintiff's RFC, the ALJ made various assignments of weight, among which was "little weight" to Dr. Haston-Fuller's July 16, 2013 GAF assessment of 47.  (R. at 27, 231-232, 162-167, 270-271.)  Within the ALJ's discussion of treatment notes, he acknowledges that Dr. Haston-Fuller was a psychiatrist who made diagnoses on more than one occasion, demonstrating that the ALJ's consideration of Dr. Haston-Fuller's opinions was informed by the "examining relationship," "treatment relationship," and "specialization" factors.  (R. at 26-29.)  20 C.F.R. §§ 404.1527(c)(1),(2),(5), 416.927(c)(1),(2),(5).

Moreover, in assigning Dr. Haston-Fuller's July 16, 2013 GAF assessment "little weight," the ALJ explained:

> . . . there is no exam documented at this time or around this time to *support* that opinion.  The records do indicate that Claimant was not compliant with medications, and documented reports from Claimant note that she was doing well when on her medication.  While later

child frequently beats up younger children, is defiant at home, and is failing at school)."  *Willis v. Comm'r of Soc. Sec.*, No. 04-10241-BC, 2006 WL 453472, at *4 (E.D. Mich. Feb. 22, 2006) (Lawson, J.).

> exams in the record after the application date do reveal some positive findings, they are not so significant to *support* a decrease in functioning *consistent* with a GAF of only 47, as explained below.

(R. at 27 (emphases added).)  Although it is not clear to which record the ALJ was specifically referring, and while Plaintiff sometimes admitted to medication compliance during April 2012 (R. at 372, 378 and 384) and in July and September 2013 (*see* R. at 163, 232, 246, 271), the Court does note that the April 7, 2012 psychiatrist evaluation / admission history and examination marks a box labeled, "Medication non-compliance."  (R. at 327.)[4]  Moreover, at her August 14, 2013 medication review with Dr. Haston-Fuller, Plaintiff reported a history of "questionable med compliance."  (R. at 27, 251, 254.)  Additionally, while is true that Plaintiff's GAF Scores are reported as a 47 in Dr. Haston-Fuller's medication review notes from August 14, 2013, September 18, 2013, October 28, 2013, December 11, 2013, and – shortly following her January 10, 2014 application for benefits – February 25, 2014 (R. at 242-255, 265-268), the nurse practitioner / clinical nurse specialist's July 8, 2015 notes indicate that Plaintiff was "doing well," "current medication [was] addressing target symptoms," and her clinical

---

[4] Even though Plaintiff does not raise a credibility challenge in this appeal, noncompliance is a sufficient reason to discount credibility.  *See Sias v. Sec's of Health & Hum. Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (concluding that the ALJ properly discounted the claimant's credibility where he failed to follow prescribed treatment); SSR 96-7p, 1996 WL 374186, at *8 (noting that "the individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

condition was "improving."  (R. at 297.)  Thus, Plaintiff's challenge to the ALJ's

comparison of Dr. Haston-Fuller's GAF assessment(s) with "later exams" is

unavailing.  (*See* DE 17 at 16, R. at 27.)

In sum, it is clear that the ALJ discounted Dr. Haston-Fuller's July 16, 2013

GAF assessment based on the supportability and/or consistency factors.  *See* 20

C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents

relevant evidence to support a medical opinion, particularly medical signs and

laboratory findings, the more weight we will give that medical opinion.  The better

an explanation a source provides for a medical opinion, the more weight we will

give that medical opinion."); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4)

("Generally, the more consistent a medical opinion is with the record as a whole,

the more weight we will give to that medical opinion.").  "An ALJ can discount the

opinion of a treating source where it is inconsistent with the record as a whole."

*Followell v. Berryhill*, Action No. 5:15-cv-00321-JMH, 2017 WL 1217167, *7

(E.D. Ky. Mar. 31, 2017).

> ### e.   Consultative examiner Terrance Mills, Ph.D.'s May 12, 2014 opinion[5]

Dr. Mills performed a mental status consultative examination.  (R. at 275-

277.)  He diagnosed major depressive disorder (as recurrent and severe with

---

[5] These notes are actually signed by both Suzann M. Kenna, M.A., L.L.P. and
Terrance A. Mills, Ph.D., L.P.  (R. at 277.)

psychotic features), possible PTSD, and ODD.  (R. at 277.)  He rated her prognosis as guarded and opined that Plaintiff could not manage her benefit funds.  (*Id*.)  She was alert, aware of her surroundings, had poor self-esteem, exhibited slow motor activity, was dependent, and had fair motivation.  (*Id.* at 276.)  She admitted to "hearing voices in the past[,]"her affect was flat, and her mood was depressed.  (*Id*.)  Significantly, she was not taking any medication, as she was pregnant.  (*Id.* at 275.)

The ALJ recognized Dr. Mills as a CE and a psychologist.  (R. at 30.)  In so doing, he addressed the examining, treating (or lack thereof) and specialization factors.  20 C.F.R. §§ 404.1527(c)(1),(2),(5), 416.927(c)(1),(2),(5).  In assigning this opinion "some weight," the ALJ noted:

> There are no mental status exams in the record or reports by Claimant that indicate any symptoms of psychosis, other than this one statement at this exam where Claimant reported having heard voices in the past. Furthermore, while there was a history of oppositional defiant disorder noted prior to the application date, subsequent treating records *do not support* that diagnosis, as noted above.  Additionally, these exam findings may not be fully indicative of Claimant's normal functioning *because she was not taking medication at this time*.  As noted above, treating records indicate that she reported doing well with a decrease of her symptoms on medication.  However, the finding that Claimant could not manage her own funds *is consistent* with the evidence of record.

(R. at 30 (emphases added); *see also* R. at 276-277.)

Plaintiff points out that, while the ALJ found that Plaintiff's symptoms "waned" after the January 10, 2014 application date, Dr. Mills May 12, 2014

13

consultative examination occurred thereafter and *still* diagnosed ODD.  (DE 17 at

20, R. at 29, 277.)  However, the ALJ acknowledged Plaintiff's history of ODD,

which seems to be a reference to Plaintiff's 2011 admission and discharge

diagnoses and perhaps even the April 2012 records from Havenwyck Hospital.

(*See* R. at 26-27, 317, 351; *see also* R. at 24.)

The Undersigned acknowledges that Plaintiff's 2011 admission and

discharge diagnoses included major depressive disorder, recurrent, with psychosis

or psychotic features and Dr. Haston-Fuller's July 16, 2013 diagnoses included

psychotic disorder, not otherwise specified.  (*See* R. at 317, 163, 232, 271.)

However:

- in April 2012, Plaintiff reported that she was not hearing any voices.  (R. at 344; *see also* R. at 372, 378, 406);

- in February 2014, she denied experiencing any hallucinations (R. at 260);

- in May 2014, she denied having auditory hallucinations (R. at 276);

- on October 15, 2014, Plaintiff reported "no auditory or visual hallucinations" to Dr. Carey (R. at 278); and,

- on July 8, 2015 she reported "NO psychosis of any kind," to the nurse practitioner/clinical nurse specialist. (R. at 297.)

Meanwhile, on various occasions during 2014 and 2015, the status of Plaintiff's

major depressive disorder, recurrent, "severe w/psycho" diagnosis remained

"pending."  (R. at 282, 285, 300, 306, 311, 316.)  These citations support the ALJ's characterization of Plaintiff's psychosis, or lack thereof.

Finally, as noted above, Plaintiff reported being pregnant at her February 25, 2014 medication review and was consequently not taking any medication at the time of her May 12, 2014 CE or her June 2, 2014 annual assessment with Development Center, Inc.  (R. at 260, 275, 285.)  She was nine months pregnant at the time of her October 15, 2014 psychiatric evaluation.  (R. at 278.)  To the extent the ALJ was relying upon exams performed during this time, it was appropriate for him to conclude that such exams might not be "fully indicative" of Plaintiff's "normal functioning."  (R. at 30.)

In the end, the ALJ permissibly discounted Dr. Mills's post-application date ODD diagnosis based on the supportability and/or consistency factors, yet agreed with Dr. Mills's opinion that Plaintiff could not manage her benefit funds.  *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).   He thus appears to have "given credit where credit was due."

### f.  Kathy A. Morrow, Ph.D.'s May 23, 2014 opinion

On May 23, 2014, when assessing Plaintiff's mental RFC, state agency psychological consultant Dr. Morrow opined that Plaintiff:  **(a)** had "understanding and memory limitations," further explaining that Plaintiff "does need reminders for certain daily tasks[;]" **(b)** had "sustained concentration and persistence

limitations," further explaining that, according to medical evidence of record and activities of daily living, at times her psychological/psychiatric symptoms "cause concentration impairment[;]" but, **(c)** did not have "social interaction limitations," further explaining that Plaintiff "does have a [history of] problems getting along with others, however, at psych CE she indicated that she has 2 friends and ADL form shows [she] participates in church activities."   (R. at 72-73.)  Additionally, Dr. Morrow explained:

> On AOL form it was reported that clmt has a number of significant psych sxs that interfere with functioning, however, medical evidence does not support this level of limitation. There is no documentation of recent psych hospitalizations and clmt has not been seen in tx for the past 2 months. The existence of a mental impairment is supported by the medical evidence, however, the severity of sxs as described by clmt are not currently supported.  Based on the totality of evidence in file, simple, unskilled work activity is not precluded.

(R. at 74.)  As to this opinion, the ALJ stated:

> . . . the opinions of the state agency reviewing medical source, Kathy Morrow, Ph.D. on May 23, 2014 is generally given great weight, as it is *supported* by the medical evidence in general, *although* Claimant is found to have moderate social limitations based on the evidence to date (Exhibit IA [R. at 67-75]).

(R. at 30 (emphases added).)

Referring to the June 2014 to July 2015 records from Dr. Carey and others at Development Centers, Inc., Plaintiff contends that "Dr. Morrow did not have the benefit of any of Dr. Carey's findings and opinions, since Dr. Carey instituted treatment after Dr. Morrow rendered her opinions."  (DE 17 at 18-19, R. at 278-

316.)  I acknowledge that, "[w]here the non-examining source did not review a complete case record," the Sixth Circuit requires "'*some indication* that the ALJ at least considered these facts before giving greater weight to an opinion' from the non-examining source."  *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (emphasis added) (citing *Blakley v. Commissioner of Social Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue,* 253 F.App'x 580, 585 (6th Cir.2007)).  Here, the ALJ at least implicitly recognized the sequence of these opinions, as his Step 4 RFC discussion acknowledges that the opinion of Dr. Morrow, "the state agency reviewing medical source," is dated May 23, 2014 (R. at 30), and the ALJ further recognized Dr. Carey's opinions as dated October 15, 2014 and December 18, 2014 (R. at 28-29).  Thus, even though the ALJ did not cite them chronologically, his assignment of greater weight to the opinion of Dr. Morrow was done with "some indication" that he considered the timing of these opinions to which he made specific assignments of weight.  This conclusion is buttressed by the ALJ's disagreement with Dr. Morrow on Plaintiff's social limitations.  Where Dr. Morrow assessed mild difficulties in maintaining social functioning and no social interaction limitations, although with explanation (R. at 71, 73), the ALJ found "moderate social limitations based on the evidence *to date*[,]" (R. at 30) (emphasis added).

Moreover, having expressly recognized Dr. Morrow's role, the ALJ was clearly aware that there was no "examining relationship," or "treatment relationship," 20 C.F.R. §§ 404.1527(c)(1),(2), 416.927(c)(1),(2).  Instead, as set forth above, it is clear that the ALJ generally gave this opinion "great weight" based on the supportability and/or consistency factors.  *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).   Furthermore, notwithstanding Plaintiff's concern that Dr. Morrow "reviewed an incomplete record" (DE 17 at 3, 14), it is without question that the ALJ knew that records post-dating Dr. Morrow's opinion could not have been reviewed by her before they were even in existence, and the ALJ's date references make clear that she was aware of this chronology.  *See*, *e.g.*, *Markland v. Comm'r of Soc. Sec.*, No. 2:15-CV-11578, 2016 WL 8116885, at *3 (E.D. Mich. Sept. 22, 2016) (by noting effective dates of non-examining, consulting medical opinion review, as well as the date of an examining (not treating) source, "the ALJ gave some indication that she considered that the consulting physicians based their review on the evidence of record in 2012, without the benefit of Dr. Garver's additional memorandum written in 2013.").

### g. Psychiatrist Theadia L. Carey, M.D.'s October 15, 2014 – June 8, 2015 opinions

On October 15, 2014, Dr. Carey performed a psychiatric evaluation.  (R. at 278-284.)  At the end of her evaluation report, Dr. Carey narrated:

> Patient is a 19 yo AA female who is 9 mos pregnant and due in 13
> days.  Patient states she has had difficulty with controlling her anger
> and feelings of depression.  No major changes in health since last
> visit.  She has been weaned off of her medications, Zoloft and
> Trazodone.  Patient will be re-evaluated in 4 weeks after baby's
> delivery to discern whether psychotropics will need to be re-
> administered.

(R. at 282, 284.)  Dr. Carey assessed Plaintiff's GAF Score as 47.  (R. at 282.)

Noting that the GAF score "had not been updated and remained at 47," the

ALJ reiterated that it was "*not supported* by the record . . . [,]" and assigned it

"little weight," explaining . . .

> Her diagnosis by Dr. Carey was posttraumatic stress disorder, along
> with a "pending" diagnosis of major depressive disorder recurrent
> severe with psychosis (Id.).  Notably, there does not appear to be
> *support* in the record for any psychotic symptoms.

(R. at 28 (emphases added).)  The rationale for this statement was discussed at

length above as to Dr. Mills and will not be repeated here.  The ALJ also

considered Dr. Carey's medication reviews as follows:

- Based on the December 3, 2014 mental status exam, "a GAF of
  47 is *not consistent* with her mental functioning and is given
  little weight."  (R. at 29 (emphasis added), 313-314.)

- The March 11, 2015 medication review "reveals functioning
  greater than what would be indicated by a GAF score of 47[.]"
  (R. at 29, 311.)

- Plaintiff's GAF score remained the same at the June 18, 2015
  medication review.  (R. at 29, 306.)

However, the ALJ also noted that, by the time of the July 8, 2015 medication review with the nurse practitioner / clinical nurse specialist, Plaintiff reported, *inter alia*, that she was "doing well."  (R. at 29, 297.)  Furthermore, while it is clear that the ALJ did in fact consider and appropriately comment on the various GAF scores, the Court does not lose sight of the fact that, while a Global Assessment Functioning score may be of "considerable help," it is not "essential" to determining an individual's RFC.  *Howard,* 276 F.3d at 241.  And it bears repeating that the Commissioner "has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  *Wind,* 133 F.App'x. 684, 692 n.5 (referencing 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000)).  Indeed, the Sixth Circuit has "affirmed denials of disability benefits where applicants had Global Assessment Functioning scores of 50 or lower[,]" and will not automatically reverse a denial of disability solely because the ALJ has failed to reference a GAF score.  *DeBoard,* 211 F. App'x at 415; *see also Kornecky*, 167 F.App'x at 511 ("we are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.").  Here, the ALJ acknowledged Plaintiff's "under 50" GAF scores and

20

made a considerable effort to discuss them and explain why they were either not controlling or not heeded.  More was not required.[6]

In the end, having recognized Dr. Carey as a "psychiatrist" within the discussion of "treating notes," (R. at 26-29), it is clear the ALJ considered the "examining relationship," "treatment relationship," and "specialization" factors. 20 C.F.R. §§ 404.1527(c)(1),(2),(5), 416.927(c)(1),(2),(5).  Moreover, the ALJ made specific assignments of "little weight" to the October and December 2014 GAF scores based on the supportability and/or consistency factors, as he was entitled to do.  *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).

### G.   CONCLUSION

Plaintiff asks the Court to consider that "with the exception of lower scores at the time of plaintiff's two hospital admissions, the scores remained within a range of 40 to 50, and were actually between 47 and 50 for the great majority of

---

[6] Plaintiff also points to her October 15, 2014 report to Dr. Carey that "[w]hen she gets angry[,]" she is "violent and throws tantrums and pull[s] knives out on people[,]" as well as the VE's testimony that an outburst against the supervisor or employer would not be tolerated, although "[i]t might be tolerated once with coworkers depending on how aggressive it is."  (DE 17 at 20, R. at 278, 65.) However, this line of argument is based on her own subjective reporting, and, as noted above, Plaintiff does not expressly challenge the ALJ's discounting of her credibility in this appeal.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'") (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir.1995) (citation omitted)).

the time." (DE 17 at 16-17.) She argues that Drs. Haston-Fuller and Carey, who

each assessed Plaintiff's GAF score as 47, had *consistent* opinions. (DE 17 at 17.)

Plaintiff also claims that, as treating sources, Drs. Haston-Fuller and Carey's

opinions were entitled to "significant, if not controlling[,] weight." (*Id.*) In sum,

Plaintiff contends that it was not a "good reason" to find that the treating and

examining physicians' GAF scores were "inconsistent with their findings." (DE

17 at 18.)

However, even if "they all rendered consistent GAF scores . . . [,]" (*id.*), the

ALJ noted in several instances that the "GAF score had not been updated," or that

the "GAF score was not changed[.]" (R. at 28-29.) "The regulation requires the

agency to 'give good reasons' for not giving weight to a treating physician in the

context of a disability determination." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d

541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (2004)). As set forth

above, the ALJ in this case provided "good reasons" for the weight he assigned to

the opinion evidence, and he was not bound by the GAF scores in the manner that

Plaintiff suggests. Further, though there is evidence in this record tending in both

directions, it is not this Court's role to re-weigh it in favor of a different outcome.

"Our task is not to reweigh the evidence. That is solely the province of the

Secretary." *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th

Cir. 1982) (citing *Wokojance v. Weinberger*, 513 F.2d 210 (6th Cir. 1975)). Nor

should the Court "resolve conflicts in evidence . . . ." *Bass*, 499 F.3d 509.  The

decision under review was made pursuant to proper legal standards, and, since

"substantial evidence supports the ALJ's decision, this Court defers to that finding

'even if there is substantial evidence in the record that would have supported an

opposite conclusion.'" *Blakley*, 581 F.3d at 406 (citation omitted).

Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's

motion for summary judgment (DE 17), **GRANT** Defendant's motion for

summary judgment (DE 20), and **AFFIRM** the Commissioner of Social Security's

decision.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated:  June 29, 2018          s/Anthony P. Patti
                               Anthony P. Patti
                               UNITED STATES MAGISTRATE JUDGE


**Certificate of Service**

I hereby certify that a copy of the foregoing document was sent to parties of record
on June 29, 2018, electronically and/or by U.S. Mail.

                               s/Michael Williams
                               Case Manager for the
                               Honorable Anthony P. Patti